# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *    *
BARBARA HESSE,                             *
                                           *    No. 13-177V
               Petitioner,                 *    Special Master Christian J. Moran
                                           *
v.                                         *
                                           *
SECRETARY OF HEALTH                        *    Filed: April 22, 2014
AND HUMAN SERVICES,                        *
                                           *    Findings of fact; onset of weakness;
               Respondent.                 *    back pain; numbness; ataxia; GBS.
* * * * * * * * * * * * * * * * * * * *    *
```

Isaiah Kalinowski, Maglio, Christopher & Toale, PA, Washington, DC, for petitioner;
Gordon Shemin, United States Dep't of Justice, Washington, DC, for respondent.

### Findings of Fact[*]

On March 7, 2013, Barbara Hesse filed a petition in the National Vaccine Injury Compensation Program (42 U.S.C. § 300aa-10 through 34 (2006)). In her petition, Ms. Hesse alleged that the flu vaccine she received on October 22, 2010, caused her to contract Guillain-Barré syndrome. On March 15, 2013, Ms. Hesse filed a set of medical records, exhibits 1-5, and her affidavit, exhibit 6. Ms. Hesse added two more affidavits (Brenda Orians and René Leonard) in the following month. Collectively, the affidavits averred that Ms. Hesse started having pain in her back and weakness in her legs in December 2010.

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

The Secretary reviewed this material in preparing her report, which was filed pursuant to Vaccine Rule 4 on July 17, 2013.  The Secretary noted that Ms. Hesse's first appointment with a medical professional after her flu vaccination was on February 2, 2011.  On this date, Ms. Hesse complained that for the last 2 weeks she suffered a sore throat and left ear ache.  Exhibit 5 at 7.  Ms. Hesse first complained about numbness in her legs when she went to the Winter Haven Hospital emergency room on February 4, 2011.  Exhibit 7 at 855.

The Secretary recognized that the account presented in the affidavits did not match the information presented in the medical records.  See Resp't's Rep't at 12-13.  At an ensuing status conference, the parties planned to hold a hearing to receive testimony from witnesses knowledgeable about Ms. Hesse's health from October 2010 until early February 2011.

Before this hearing was held, Ms. Hesse submitted an affidavit from her husband, Robert.  Exhibit 14.  Ms. Hesse and Mr. Hesse testified, via videoconferencing, at a hearing held on December 4, 2013.[1]

At the end of the hearing, the parties stated they did not want to file briefs.  Instead, the parties identified four topics about which the special master should find facts.  These topics were when Ms. Hesse started to experience weakness, pain, numbness, and ataxia.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records that are created contemporaneously with the events they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

---

[1] Ms. Hesse did not ask Ms. Orians or Ms. Leonard to testify.

Not only are medical records presumed to be accurate, they are also presumed to be complete in the sense that the medical records present all the health problems of the patient. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all of their health problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is <u>Cucuras</u> in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. <u>Cucuras</u>, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred." <u>Cucuras v. Sec'y of Health & Human Servs.</u>, 26 Cl. Ct. 537, 543 (1992), <u>aff'd</u>, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions from the Court of Federal Claims have followed <u>Cucuras</u> in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. <u>See, e.g.</u>, <u>Doe/70 v. Sec'y of Health & Human Servs.</u>, 95 Fed. Cl. 598, 608 (2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), <u>aff'd sub nom.</u> <u>Rickett v. Sec'y of Health & Human Servs.</u>, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); <u>Doe/17 v. Sec'y of Health & Human Servs.</u>, 84 Fed. Cl. 691, 711 (2008); <u>Ryman v. Sec'y of Health & Human Servs.</u>, 65 Fed. Cl. 35, 41-42 (2005); <u>Snyder v. Sec'y of Health & Human Servs.</u>, 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master

questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

However, the presumption that contemporaneously created medical records are accurate and complete is rebuttable.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims listed four such explanations.  The Court noted that inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203-4 (2013), aff'd, 2014 WL 1258137 (Fed. Cir. Mar. 28, 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).  However, compelling oral testimony may be more persuasive than written records.  Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking.");  Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate");  Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct.

726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance") (citation omitted), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records.  An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying.  Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## General Assessment of Witnesses

Although Ms. Hesse appeared to testify forthrightly, her memory of the relevant time frame is not strong.  One basic problem is that the critical events happened approximately three years ago.  In the intervening time, her recollection inevitably must have faded.  See Tr. 157.  In addition, the experience of being hospitalized for her Guillain-Barré syndrome was very traumatic for her.  Tr. 46-50.  As a result, she, by her own admission, does not recall many events independently.  See Tr. 17 (failing to recall conversations with Ms. Orians or Ms. Leonard), 69 (failing to recall conversations with emergency medical technicians and Dr. Reddy), 83 (failing to recall details about the back pain before traveling to Florida in November, 2010), 88 (failing to recall New Year's Eve).  In the absence of an independent memory, Ms. Hesse testified about events that her husband described to her.  Tr. 39, 70, 99.  Even with her husband's assistance, Ms. Hesse could not recall many details about her health from October 2010 to February 2011.

Likewise, Mr. Hesse appeared to testify as best as he was able to recall.  However his knowledge of his wife's health (weakness, pain, and numbness) derives from her experiences and communication to him.  Both Ms. and Mr. Hesse testified that Ms. Hesse seldom complained about physical ailments and her reluctance to see a doctor when she was ill created tension in their marriage.  Tr. 25-26, 109.  Thus, although Mr. Hesse was not as traumatized as Ms. Hesse, Mr. Hesse's recollection was not particularly compelling.

Overall, the witnesses' testimony was not sufficiently persuasive to overcome a presumption that the medical records created in early February 2011 described Ms. Hesse's medical history accurately.

5

**Specific Findings of Fact**

Back Pain

 Mr. and Ms. Hesse planned to drive from their home in Ohio to their residence in Florida, leaving on Saturday, November 12, 2010.  Ms. Hesse was responsible for packing their belongings into boxes for the trip.  A few days before their anticipated departure, Ms. Hesse developed a pain in her back.  She did not help carry luggage into the Hesses' truck.  Tr. 13-15, 57-59, 104-05.

 Ms. Hesse's back pain persisted.  She asked her husband to purchase a massage chair that she saw advertised on television.  He did so and gave her the chair as a present before Christmas.  Tr. 22, 109, 155.

 Ms. Hesse's back pain did not interfere with her ability to walk in November or December 2010.  For example, she could routinely go on the short walk from her residence to the neighborhood clubhouse. Tr. 19.

Weakness

 In Ms. Hesse's affidavit, she stated she had weakness in her lower limbs, starting no later than mid-December 2010.  Exhibit 6 at ¶ 3.  In Ms. Hesse's oral testimony, she associated weakness with an illness that kept her in bed on Thanksgiving.[2]  Tr. 92.  This inconsistency about when her weakness began calls into question the accuracy of Ms. Hesse's recollections.  In addition, Ms. Hesse, in early January 2011, signed up to participate in a line dancing class.  It seems unlikely that a person with problems in their legs would voluntarily participate in an activity requiring much movement.  But see Tr. 101 (Ms. Hesse: stating she was a "fool" for signing up for the dance class).

 More persuasive evidence comes from the medical records created in early February 2011.  At Winter Haven Hospital, Ms. Hesse told Dr. Reddy, on February 6, 2011, that she had a "sore throat and cough 2 weeks ago.  Took Z-PAK.  Since

---

[2] Ms. Hesse's physical and emotional state on Thanksgiving is unclear.  She stated that an illness kept her from attending a Thanksgiving Day dinner at her community's clubhouse with her husband.  She stated that this sickness was the only reason she did not leave the house.  Tr. 18-20.  But, she later testified that she was also angry at her son for choosing to go on a cruise, rather than celebrate Thanksgiving with his parents.  Tr. 28.

yesterday, feeling weakness in her lower extremities.  The patient initially had tingling in both upper and lower extremities and felt weakness in both upper and lower extremities, more so in the lower extremities."  Exhibit 7 at 98.  Dr. Reddy referred her to Richard Hostler, a neurologist.

Dr. Hostler's history is consistent with the history Dr. Reddy obtained.  Ms. Hesse told Dr. Hostler that she "recalls developing paresthesias in the hands and feet, associated with some weakness of both on Thursday.[3]  This progressed over the intervening days to today being Sunday, February 6, 2011, at which time she is no longer ambulatory."  Exhibit 7 at 102.

In a third account, Ms. Hesse stated she has been "weak with [sore throat] / [upper respiratory infection] symptoms for the last few days."  Exhibit 7 at 862.

In addition to the affirmative evidence of when Ms. Hesse weakness began, there is also negative evidence.  When she went to the urgent care center on February 2, 2011, she listed her chief complaint as a sore throat.  Exhibit 5 at 7.  She did not list weakness or pain in her legs as a problem on February 2, 2011.  Tr. 66-67, 98, 121.  Although not dispositive of the issue, the omission of a complaint about weakness or pain on February 2, 2011, tends to suggest that Ms. Hesse was not having weakness or pain on that date.

In short, Ms. Hesse's weakness began on February 3, 2011, and progressed over the next three days.  See Exhibit 7 at 862 (indicating that the onset of symptoms was "acute").

Numbness

As distinct from weakness and pain, there was less evidence about numbness.  For example, Ms. Hesse's affidavit does not mention numbness at all.  See exhibit 6.

Without any persuasive testimony, it is relatively easy to accept Ms. Hesse's account about her numbness given in February 2011.  In a record from Winter Haven Hospital, Ms. Hesse was reported to have stated that after taking the Z-pack prescribed by the urgent care center, "she felt pins and needles after taking this med[ication]."  Exhibit 7 at 856; accord Tr. 146-47.  Ms. Hesse's February 6, 2011 account to emergency medical technicians stated that her numbness began on

---

[3] February 3, 2011, was a Thursday.

February 2, 2011, which is the same day as she visited the urgent care center. Exhibit 7 at 13. As noted in the text, other records indicate that her numbness, tingling, and weakness started after she began to take the Z-pack. Thus, it is likely that Ms. Hesse was simply mistaken, by one day, when she said her symptoms started on February 2, 2011. The entire record supports a finding that the onset of problems was February 3, 2011.

Her recollection was given only a few days after the numbness apparently began. Her recounting was to medical professionals who were going to treat her. As such, Ms. Hesse's case strongly resembles the situation the Federal Circuit described in <u>Cucuras</u>. Her ability to recollect was strong and her motivation to describe her problems as accurately as possible was high. Ms. Hesse's later attempt to revise what she told doctors in February 2011 is not credible.

<u>Ataxia</u>

In Ms. Hesse's oral testimony, she described that she could not walk freely around her residence by mid-January 2011. She stated that to move around, she needed to hold onto countertops and chairs. Tr. 24, 101. She also testified that she required assistance from her husband exiting his pickup truck and going into the urgent care clinic on February 2, 2011. Tr. 97. A similar description of problems in ambulation does not appear in her affidavit. <u>See</u> exhibit 6, ¶ 6-9 (listing Ms. Hesse's mid-January problem as a sore throat).

This testimony is difficult to credit. Although Ms. Hesse is a person who prefers not to see doctors, Tr. 21, a persistent problem in a basic activity of daily living, such as walking, is likely to motivate a person to seek medical attention. Mr. Hesse would likely insist that his wife seek some help if she could not walk around the house. Furthermore, if Ms. Hesse had to be helped into the urgent care center, she likely would have reported the problem on the list of complaints. But, she did not. Exhibit 5 at 7.

A more persuasive date of onset for Ms. Hesse's trouble with walking comes from records created at Winter Haven Hospital. There, she stated that she "was started on a Z[-]pack and woke up the next morning with tingling in her ext[remities] and feeling of being off balance with any ambulation." Exhibit 7 at 862. Dr. Hostler's record is even more specific. He reported that as of February 6, 2011, "she is no longer ambulatory." Exhibit 7 at 102.

Ms. Hesse first had trouble walking on February 6, 2011.

8

## **Conclusion**

The parties are ordered to provide these Findings of Fact to any expert whom they may retain to offer an opinion in this case.  An expert's assumption of any fact that is inconsistent with these Findings of Fact will not be credited.  <u>Burns v. Sec'y of Health & Human Servs.</u>, 3 F.3d 415, 417 (Fed .Cir. 1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record").

A status conference will be held on **Wednesday, May 14, 2014 at 3:00 P.M. Eastern time**.  Ms. Hesse should be prepared to discuss her proposed next steps for this case.

**IT IS SO ORDERED.**


<u>S/Christian J. Moran</u>
Christian J. Moran
Special Master